# In The United States Court of Appeals for the Eighth Circuit

SAMANTHA STINSON, *et al.*,
*Plaintiffs-Appellees,*

v.

STATE OF ARKANSAS,
*Intervenor-Appellant.*

On Appeal from the United States District Court for the
Western District of Arkansas

## Brief of Professor Stephanie H. Barclay as *Amicus Curiae* in support of Intervenor-Appellant

Eric C. Rassbach
The Hugh & Hazel Darling
Foundation Religious Liberty Clinic
Pepperdine University Caruso
School of Law
24225 Pacific Coast Highway
Malibu, CA 90263
+1.310.506.4611
eric.rassbach@pepperdine.edu

Eric P. Leis
JONES DAY
500 Grant St., Suite 4500
Pittsburgh, PA 15219
+1.412.319.3939

Noel J. Francisco
 *Counsel of Record*
Hannah L. Templin
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001.2113
+1.202.879.3939
njfrancisco@jonesday.com

Kurt A. Johnson
JONES DAY
150 West Jefferson
Suite 2100
Detroit, Michigan, 48226.4438
+1.313.733.3939

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

INTEREST OF THE *AMICUS CURIAE* ..................................................... 1

INTRODUCTION ................................................................................... 1

ARGUMENT.......................................................................................... 6

I.    Act 573 Is Consistent With The Establishment Clause. ...................... 6

    A. Only Certain Historical Hallmarks Recognized At The Founding—Rather Than Mere Public Religious Displays—Constitute An Establishment Of Religion. ................................... 6

    B. The Public Religious Display Required By Act 573 Bears None Of The Historical Hallmarks Of An Establishment. ............ 12

    C. The District Court Erred By Applying The Abrogated *Lemon* Test.................................................................................. 19

II.   Act 573 Does Not Violate The Free Exercise Clause. ........................ 26

CONCLUSION.......................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*ACLU Neb. Found. v. City of Plattsmouth,*
419 F.3d 772 (8th Cir. 2005) ....................................................... 13

*Am. Legion v. Am. Humanist Ass'n,*
588 U.S. 29 (2019) ........................................................... *passim*

*Books v. City of Elkhart,*
235 F.3d 292 (7th Cir. 2000) ................................................ 13, 17

*Carson v. Makin,*
596 U.S. 767 (2022) ................................................. 2, 16, 19, 26

*Cath. Charities Bureau, Inc. v. Wisc. Lab. & Indus. Rev. Comm'n,*
605 U.S. 238 (2025) .................................................................... 2

*Cnty. of Allegheny v. ACLU,*
492 U.S. 573 (1989) ............................................................ 20, 23

*Espinoza v. Mont. Dep't of Revenue,*
591 U.S. 464 (2020) ................................................................. 16

*Firewalker-Fields v. Lee,*
58 F.4th 104 (4th Cir. 2023) .................................................... 10

*Fulton v. City of Phila.,*
593 U.S. 522 (2021) ................................................................. 19

*Groff v. DeJoy,*
606 U.S. 447 (2023) ................................................................... 5

*Hilsenrath ex rel. C.H. v. Sch. Dist. of Chathams,*
136 F.4th 484 (3d Cir. 2025) .................................................... 11

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
565 U.S. 171 (2012) ................................................................. 13

*Kennedy v. Bremerton Sch. Dist.,*
4 F.4th 910 (9th Cir. 2021) ...................................................... 24

*Kennedy v. Bremerton Sch. Dist.,*
597 U.S. 507 (2022) ..................................................................... *passim*

*Lemon v. Kurtzman,*
403 U.S. 602 (1971) ..................................................................... *passim*

*Mahmoud v. Taylor,*
606 U.S. 522 (2025) ..................................................................... *passim*

*Marsh v. Chambers,*
463 U.S. 783 (1983) .......................................................................... 23

*Nathan v. Alamo Heights Independent Sch. Dist.,*
173 F.4th 576 (5th Cir. 2026) .................................................... *passim*

*Pierce v. Soc'y of Sisters,*
268 U.S. 510 (1925) .......................................................................... 26

*Shurtleff v. City of Boston,*
596 U.S. 243 (2022) ..................................................................... *passim*

*Stinson v. Fayetteville Sch. Dist. No. 1,*
2025 WL 2231053 (W.D. Ark. Aug. 4, 2025) ......................................17

*Stinson v. Fayetteville Sch. Dist. No. 1,*
2026 WL 736964 (W.D. Ark. Mar. 16, 2026) ................................ *passim*

*Stone v. Graham,*
449 U.S. 39 (1980) ...................................................................... *passim*

*Town of Greece v. Galloway,*
572 U.S. 565 (2014) ..............................................................9, 14, 22

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
582 U.S. 449 (2017) .......................................................................... 16

*Van Orden v. Perry,*
545 U.S. 677 (2005) ..................................................................... *passim*

*W. Va. State Bd. of Educ. v. Barnette,*
319 U.S. 624 (1943) ..............................................................26, 28, 29

*Walz v. Tax Comm'n of City of New York,*
397 U.S. 664 (1970) .......................................................................... 16

*Wisconsin v. Yoder,*
406 U.S. 205 (1972) ............................................................. 26, 27

**Other Authorities**

Ark. Code Ann. § 16-123-503 .......................................................17

Ark. Code Ann. § 1-4-133.........................................................4, 17

Brief of Various Professors as *Amici Curiae* Supporting Petitioners, *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29 (2019) (Nos. 17-1717 & 18-18) ............................................................ 3

Clint W. Ensign, *Inscriptions of a Nation: Collected Quotations from Washington Monuments* (1994).............................................3

James Madison, Memorial and Remonstrance Against Religious Assessments (1785) ............................................................... 2

Jenna Weissman Joselit, *Set in Stone: America's Embrace of the Ten Commandments* (2017) .......................................................8

Mark David Hall & Andrea Picciotti-Bayer, *Ten Commandments in the Public Square and Public Schools*, 34 WM. & MARY BILL RTS. J. 175 (2025).................................................................... 7, 8

Mark Storslee & Michael Helfand, *Government Religious Speech and the Establishment Clause*, 79 VANDERBILT L. REV. (forthcoming 2026).............................................................15

Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 WM. & MARY L. REV. 2105 (2003)................................................ *passim*

Michael W. McConnell, *No More (Old) Symbol Cases*, 2019 CATO SUP. CT. REV. 91.......................................................6

Stephanie H. Barclay et al., *Original Meaning and the Establishment Clause: A Corpus Linguistics Analysis*, 61 ARIZ. L. REV. 505 (2019) .............................................1, 3, 8

Stephanie H. Barclay, *Replacing Smith*, 133 YALE L.J. FORUM 436 (2023)..........................................26

Stephanie H. Barclay, *The Religion Clauses After* Kennedy v. Bremerton School District, 108 IOWA L. REV. 2097 (2023) .......................... 1, 10, 11, 13

Stephanie Barclay, *The Ten Commandments Return to Federal Court*, SCOTUSBlog (Jan. 23, 2026) ................................................... 21

Transcript of Oral Argument at 48, *Mahmoud v. Taylor*, 606 U.S. 522 (2025) (No. 24-297) ........................................... 28

William Strachey, *Articles, Laws, and Orders, Divine, Politic and Martial for the Colony of Virginia (1612)*, ENCYCLOPEDIA VA. ........................ 14, 16

## INTEREST OF THE *AMICUS CURIAE*

*Amicus* Stephanie H. Barclay is a professor at Georgetown Law Center where she specializes in constitutional law and religious freedom.[1] Her scholarship focuses on how the Religion Clauses work in tandem to protect religious liberty. Of particular relevance are Professor Barclay's 2023 article, *The Religion Clauses After* Kennedy v. Bremerton School District, 108 Iowa L. Rev. 2097, which analyzes the Supreme Court's return to a historical understanding of the Establishment Clause, and her co-authored 2019 article, *Original Meaning and the Establishment Clause: A Corpus Linguistics Analysis*, 61 Ariz. L. Rev. 505, which performs a corpus linguistics analysis on the use of the term "Establishment of Religion" and related phrases leading up to and during the Founding. Professor Barclay writes to explain how the historical analysis required by *Kennedy* applies to the Arkansas law in this case.

## INTRODUCTION

The Religion Clauses of the First Amendment embody the principle that "[t]he Religion ... of every man must be left to the conviction and

---

[1] All parties have consented to the filing of this brief. Fed. R. App. P. 29(a)(2). No counsel for any party authored this brief in whole or in part, and no person other than *amicus curiae* or her counsel contributed money that was intended to fund the preparation or submission of this brief. *Id.* 29(a)(4)(E).

conscience of every man," and the principle that "it is the right of every man to exercise it as these may dictate." James Madison, Memorial and Remonstrance Against Religious Assessments (1785). The Establishment Clause protects the first principle: it prevents the State from engaging in certain historical practices reflecting "differential treatment across religions on denominational lines." *Cath. Charities Bureau, Inc. v. Wisc. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 247–48 (2025) (citation modified). The Free Exercise Clause protects the second principle: it prevents the State from interfering with voluntary religious exercise, through coercion or other means. *See Carson v. Makin*, 596 U.S. 767, 778 (2022). Together, the two clauses secure for all Americans the great blessing of religious liberty.

But that liberty is *for* religion—not *from* religion. Accordingly, the religious liberty protected by the Religion Clauses has never required the government to "purge from the public sphere anything an objective observer could reasonably infer endorses or partakes of the religious." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022). To the contrary, "[f]or most of its existence, this country had an unbroken history of official acknowledgement by all three branches of government of the role of religion in American life." *Shurtleff v. City of Boston*, 596 U.S. 243, 287 (2022) (Gorsuch, J., concurring). Religious phrases decorate public buildings—like

Micah 6:8's exhortation "to walk humbly with thy God." Clint W. Ensign, *Inscriptions of a Nation: Collected Quotations from Washington Monuments* 22 (1994). Religious symbols pervade public lands—like the Bladensburg Peace Cross. *See* Brief of Various Professors as *Amici Curiae* Supporting Petitioners, *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29 (2019) (Nos. 17-1717 & 18-18). And, most relevant here, although many "Jews and Christians" consider the Ten Commandments "the word of God handed down to Moses on Mount Sinai," the Ten Commandments "are depicted" in "prominent public buildings" across the nation—including in "the marble frieze in [the Supreme Court's] courtroom." *Am. Legion*, 588 U.S. at 53.

The Supreme Court has repeatedly upheld the constitutionality of such public religious displays. And it has done so because a "close look at … our history" confirms that "no one at the time of the founding" thought "the use of religious symbols in public contexts was a form of religious establishment." *Shurtleff*, 596 U.S. at 287 (Gorsuch, J., concurring). Indeed, as the Court has underscored, a government that "roams the land, tearing down monuments with religious symbolism and scrubbing away any reference to the divine," would express the very hostility to religion that the Religion Clauses "seek[] to avoid." *Am. Legion*, 588 U.S. at 56–57 (citation modified); *see also* Barclay, *Original Meaning, supra* at 557 ("[W]hen

concerns about religious symbols did arise, they arose where government was suppressing or destroying symbols of dissenting churches.").

That history resolves this case. Arkansas's Act 573 requires no more (and in many cases less) than what is on display in countless public buildings and monuments across the country: the text of the Ten Commandments, alongside the national motto and the United States and state flags. Ark. Code Ann. § 1-4-133. Act 573 does not compel students' participation in a state-established liturgy, or punish those for whom the Ten Commandments are not a matter of faith. Nor does the display required by Act 573 threaten to undermine the religious beliefs or practice that any parents may wish to transmit to their children. That is, Act 573 violates neither the Establishment Clause nor the Free Exercise Clause—but instead is fully in keeping with the principles the Religion Clauses protect.

The district court concluded otherwise only by misapprehending the applicable law. Dismissing history outright as "unhelpful and irrelevant," the district court instead relied on a 45-year-old *per curiam* decision of the Supreme Court, *Stone v. Graham*, involving a similar Kentucky statute directing that classrooms display the Ten Commandments. *Stinson v. Fayetteville Sch. Dist. No. 1*, 2026 WL 736964, at *7, 10 (W.D. Ark. Mar. 16, 2026). In *Stone*, the Court reasoned that "[t]he pre-eminent purpose" of the

4

statute was "plainly religious in nature" because "[t]he Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths." 449 U.S. 39, 41 (1980). The Court then set aside the statute—applying the then-prevailing *Lemon* test, under which any law ostensibly motivated by a religious purpose was an unconstitutional establishment. *See id.* at 40–41 (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971)). Copying *Stone*, the district court here likewise determined that Arkansas could have no "plausible secular purpose" for enacting Act 573. *Stinson*, 2026 WL 736964, at *9.

To look to *Stone*, and thus to *Lemon*, was an error. The Supreme Court "long ago abandoned *Lemon*," and the Justices have repeatedly chided lower courts for relying on "*Lemon* and its progeny"—especially, as here, when evaluating the constitutionality of public religious displays. *Kennedy*, 597 U.S. at 535 & n.4; *see also Groff v. DeJoy*, 600 U.S. 447, 460 (2023); *Shurtleff*, 596 U.S. at 284–85 (Gorsuch, J., concurring); *Am. Legion*, 588 U.S. at 48–57; *id.* at 69 (Kavanaugh, J., concurring); *id.* at 86 (Gorsuch, J., concurring). Indeed, as the en banc Fifth Circuit recently explained when upholding a similar Texas law, to "keep applying *Stone* … would be to ignore *Lemon*'s abrogation." *Nathan v. Alamo Heights Indep. Sch. Dist.*, 173 F.4th 576, 589 (5th Cir. 2026).

At bottom, what matters in this context is history, not doctrine: the historical practice of religious exercise in this country, including through public religious displays, not the doctrinal formulations of obsolete decisions like *Stone* and *Lemon*. This Court should hold that Act 573 is consistent with the Religion Clauses and reverse the permanent injunction.

## ARGUMENT

## I.   Act 573 Is Consistent With The Establishment Clause.

The Establishment Clause is rooted in the history of our country, and in the hallmarks of religious establishments at the Founding. Because Act 573 has none of those hallmarks, it is constitutional. The district court held otherwise only by relying on aberrant and long-abandoned decisions.

### A.   Only Certain Historical Hallmarks Recognized At The Founding—Rather Than Mere Public Religious Displays—Constitute An Establishment Of Religion.

Throughout American history, public religious displays have been treated as indisputably constitutional. On Independence Day, a committee "that included Benjamin Franklin and Thomas Jefferson … was tasked by the Continental Congress with designing a seal for the new nation." Michael W. McConnell, *No More (Old) Symbol Cases*, 2019 CATO SUP. CT. REV. 91, 107. Their proposal bore the words, "Rebellion to Tyrants Is Obedience to God," above a scene of Moses leading the Israelites across the Red Sea. *Id.* Thirteen years later—as the First Congress debated the provision that would become

6

the Establishment Clause—George Washington began his presidency with the words, "So help me God," and implored the public to engage in "a day of public thanksgiving and prayer" for the "Supreme Being['s]" role in "the foundations and successes of our young Nation." *Id.* at 108–09.

Many of these public religious displays involved "[b]iblical quotations and religious phrases," often including the Ten Commandments. Mark David Hall & Andrea Picciotti-Bayer, *Ten Commandments in the Public Square and Public Schools*, 34 WM. & MARY BILL RTS. J. 175, 206 (2025). For example, a "medallion with two tablets depicting the Ten Commandments decorates the floor of the National Archives." *Van Orden v. Perry*, 545 U.S. 677, 689 (2005) (plurality op.). A mile down the road, "a large statue of Moses holding the Ten Commandments, alongside a statue of the Apostle Paul, has overlooked the rotunda of the Library of Congress's Jefferson Building since 1897." *Id.* And next door, a carving of Moses "holding two tablets that reveal portions of the Ten Commandments written in Hebrew" gazes over the Supreme Court's courtroom. *Id.* at 688.

Not only have the Ten Commandments been a common feature of public religious displays, they also have played a prominent role in the education of American children. As one historian summarized, "[w]hether taught at home or at school, the Ten Commandments were once a central

7

feature of the moral education of American children. Students committed them to memory, declaimed them from the stage, and even put them to song." Jenna Weissman Joselit, *Set in Stone: America's Embrace of the Ten Commandments* 63 (2017). Indeed, popular textbooks such as *The New England Primer*, *McGuffey's Eclectic Reader*, and Noah Webster's *American Spelling Book* reproduced portions and quizzed students on their application. Hall & Picciotti-Bayer 221–22.

No one at the Founding—or for many decades thereafter—understood such displays or practices to raise constitutional concerns. In fact, *Amicus*'s own historical research supports the conclusion that government religious displays were not viewed as an impermissible establishment at the Founding. Specifically, she and her co-authors performed a corpus linguistics analysis assessing, among other things, over 1,200 results of Founding-era sources that used a version of the word "establish" in a statistically relevant proximity to some religious word. *See* Barclay, *Original Meaning, supra* at 538–48 (discussing methodology). Their review did not reveal any Founding-era expressions of concern about government religious displays constituting an establishment of religion. To the contrary, their "results indicated that when concerns about religious symbols did arise, they arose where government was suppressing or destroying symbols of dissenting churches." *Id.* at 557.

To *Amicus*'s knowledge, there is no historical evidence that mere government displays of religious items to audiences were understood as a problematic type of religious coercion constituting a forbidden establishment.

Rather than resist that historical record, the Supreme Court's recent Establishment Clause precedents follow from it. The Court has repeatedly "instructed that the Establishment Clause" must be interpreted in "accord with history and faithfully reflect the understanding of the Founding Fathers." *Kennedy*, 597 U.S. at 535–36. Of course, there is no place for the historical "establishments the framers sought to prohibit when they adopted the First Amendment." *Id.* at 537. But courts must also take care not to trample on any "practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Town of Greece v. Galloway*, 572 U.S. 565, 577 (2014).

Thus, challengers to alleged religious establishments—including the plaintiffs here—bear the burden of demonstrating that the challenged law, display, or practice fits the historical definition of an "establishment."[2]

---

[2] The district court thought it was "odd" that the State did not initially "retain[] a history expert" to opine on the historical definition of an 'establishment.' *Stinson*, 2026 WL 736964, at *10. Quite the opposite: expert testimony is *never* appropriate to opine on the "legal question" of "[w]hat the

*Kennedy*, 597 U.S. at 537–40, 540 n.6; *Nathan*, 173 F.4th at 583. This burden applies in *every* Establishment Clause case, including those that (like *Kennedy*) involve "public-school children." *Contra Stinson*, 2026 WL 736964, at *9. Though evidence of an unbroken historical practice strongly suggests constitutionality, the lack of a historical twin does not necessarily suggest unconstitutionality—particularly when the burden is on plaintiffs to prove that a law *is* an establishment, rather than on the State to disprove the charge. *See Nathan*, 173 F.4th at 603, 606–07; *Firewalker-Fields v. Lee*, 58 F.4th 104, 122 n.7 (4th Cir. 2023). *Contra Stinson*, 2026 WL 736964, at *10.

"[I]n the late 18th century, an 'establishment of religion' was a familiar institution." *Nathan*, 173 F.4th at 583. "The paradigm was the Church of England," but "[o]ver half the states" also "had establishments when the First Amendment was adopted." *Id.* These establishments "took various forms," but they "all shared at least some" characteristics. *Id.* In particular, *Kennedy* instructs courts to focus on six specific "historical hallmarks," Barclay, *Religion Clauses*, *supra* at 2104, including:

- government control over the doctrine and personnel of an established church;

---

founding generation understood as an establishment of religion." *Nathan*, 173 F.4th at 607.

- mandatory attendance in the established church, backed up with punishment for those who failed to participate;

- financially supporting the established church, often in a way that disfavored others;

- persecution of dissenting churches and individuals for their religious exercise;

- restrictions on political participation by dissenters; and

- use of the established church to carry out certain civil functions, often giving the established church a monopoly over that function.

*Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring) (describing hallmarks); *see also Kennedy*, 597 U.S. at 537 n.5 (incorporating hallmarks); *Hilsenrath ex rel. C.H. v. Sch. Dist. of Chathams*, 136 F.4th 484, 491 & n.54 (3d Cir. 2025) (Hardiman, J.) (recognizing that *Kennedy* adopted hallmarks); *Nathan*, 173 F.4th at 601 (same).

Many of the hallmarks "reflect forms of coercion regarding religion or its exercise." *Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring); *accord* Barclay, *Religion Clauses, supra* at 2104–05. But the coercion must be serious—like compulsory church attendance or punishment of dissenters—not just abstract pressure on the viewer. "[T]he Establishment Clause does not include anything like a modified heckler's veto, in which religious activity

can be proscribed based on perceptions or discomfort." *Kennedy*, 597 U.S. at 534 (citation modified). Only these historical hallmarks can constitute a forbidden religious establishment.

### B. The Public Religious Display Required By Act 573 Bears None Of The Historical Hallmarks Of An Establishment.

Though the district court failed to conduct the relevant analysis, *see Stinson*, 2026 WL 736964, at *9–10, the historical record is clear: public religious displays such as that required by Act 573 do not bear any of the historical hallmarks of an establishment of religion.

*First*, Act 573 does not regulate the doctrine or personnel of any church. Historically, governments controlled established churches by resolving doctrinal disputes, crafting the liturgy, and appointing or removing the clergy. Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 WM. & MARY L. REV. 2105, 2132–44 (2003). In England, Parliament controlled the doctrine and liturgy of the Anglican Church through the Acts of Uniformity, which punished ministers who deviated from the Book of Common Prayer and outlawed public worship in other churches. *Id*. at 2132–33. Likewise in the colonies, legislatures enacted laws regulating the established church's articles of faith, prescribing substantive church canons, and governing the liturgy. *Id*. at 2133–36. Both English and colonial governments also

exercised the power to appoint the church's bishops and other clergy. *Id.* at 2136–44; *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 182 (2012). Safeguards against this hallmark are "reflected in part through the Court's ministerial exception and church autonomy jurisprudence." Barclay, *Religion Clauses*, *supra* at 2105.

Here, Act 573 does not assert any remotely comparable power. Indeed, it has nothing to do with internal church governance, and in fact does not regulate religious organizations at all. Nor does the law create any sort of state liturgy. *See id.* at 2108. The law merely directs the posting of the Ten Commandments in public schools—and a version that both the Supreme Court and this Court have approved as "nonsectarian." *Van Orden*, 545 U.S. at 701; *ACLU Neb. Found. v. City of Plattsmouth*, 419 F.3d 772, 773 & n.2 (8th Cir. 2005); *see also Books v. City of Elkhart*, 235 F.3d 292, 296 (7th Cir. 2000) (describing identical text as "an amalgamation of Jewish, Protestant, and Catholic versions").

***Second***, Act 573 does not compel or coerce church attendance or any form of religious activity. The types of coercion "the framers sought to prohibit when they adopted the First Amendment" were severe. *Kennedy*, 597 U.S. at 537. At Jamestown, for example, the penalty for missing three daily services was "to be condemned to the Gallies for six Moneths," and the

penalty for three violations of the Sabbath was "to suffer death." William Strachey, *Articles, Laws, and Orders, Divine, Politic and Martial for the Colony of Virginia (1612)*, ENCYCLOPEDIA VA. And "a study of grand jury presentments in Virginia between 1720 and 1750" found that "missing church was the most common indicted offense in eleven of the twenty-two counties." McConnell, *Establishment of Religion*, *supra* at 2145.

Here, Act 573, by contrast, does not call for any conduct on the part of students—let alone punish students who fail to participate. It does not require students to participate in a public ceremony—or even listen to the Ten Commandments read aloud. The students are merely present in the same space as a passive display on the wall. But mere proximity to religious content has never been considered coercion. *Kennedy*, 597 U.S. at 537–38; *Mahmoud v. Taylor*, 606 U.S. 522, 559–60 (2025); *cf. Stone*, 449 U.S. at 42 (explaining that "merely post[ing]" the Ten Commandments "on the wall" is "relatively minor" compared to practices like school prayer). Indeed, posting the Ten Commandments on a classroom wall is no more coercive than erecting a monument of the Ten Commandments in other government buildings, *see Van Orden*, 545 U.S. 677, or beginning a legislative session with prayer, *see Town of Greece*, 572 U.S. 565.

The district court disagreed because it thought the classroom context makes this religious display uniquely coercive. *See Stinson*, 2026 WL 736964, at *9; *see also* Mark Storslee & Michael Helfand, *Government Religious Speech and the Establishment Clause*, 79 VANDERBILT L. REV. (forthcoming 2026) (manuscript at 165–71) (distinguishing Act 573 from historical religious displays by calling elementary students a captive audience).[3] Of course, U.S. courtrooms often display the Ten Commandments, and parties who must appear in court are a type of captive audience, too. The same goes for other public buildings citizens often must enter.

At any rate, not "a shred of founding-era evidence" suggests that anyone at the Founding viewed exposure to religious content alone—whether to elementary school students or anyone else—as the type of coercion with which the Establishment Clause was concerned. *Nathan*, 173 F.4th at 602.

---

[3] Storslee and Helfand argue a court should attempt to "identify[] circumstances in which government is moving beyond acknowledging or reflecting the religious makeup of the citizenry and instead using its power to foster religious conformity." Storslee & Helfand, *supra*, at 101. Ultimately, this test is vulnerable to the same Siren call that gave rise to *Lemon*: to find an "ambitious" and "abstract" principle that runs through the historical hallmarks of an established religion, and then to treat that principle as the actual law. *Kennedy*, 597 U.S. at 510. But *Kennedy* replaced such abstraction with concrete historical hallmarks that are straightforward to identify and apply.

Instead, the type of coercion the Framers had in mind was being "condemned to the Gallies for six Moneths," or worse—not simply seeing a public religious display. Strachey, *supra*; *see also* McConnell, *Establishment of Religion*, *supra* at 2144–46.

***Third***, Act 573 does not require the type of preferential financial support for any religion that would raise Establishment Clause concerns. Both England and the colonies often levied tithes and taxes to support an established church. McConnell, *Establishment of Religion*, *supra* at 2146–59. For example, in Massachusetts Bay Colony, ministerial taxes were levied on "all those who did not contribute voluntarily to the support of the town minister." *Id.* at 2152. A few States eventually "broaden[ed] the base of their establishments" by allowing citizens to direct their tithe to the church of their choice, but often provided no secular alternative. *Id.* at 2153, 2159.

Here, by contrast, no taxpayer money is allocated for Act 573.[4] Rather, the law expressly provides that the Ten Commandments are to be "either

---

[4] Of course, a law does not necessarily violate the Establishment Clause simply because it allows taxpayer funds to be used for religious purposes or grants religious organizations a financial benefit. *See, e.g.*, *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664 (1970); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020); *Carson*, 596 U.S. 767. The problem arises when the taxpayer funds are given in a preferential way, such as to one religious denomination over another. *See Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring).

donated or purchased solely with funds made available through voluntary contributions." Ark. Code Ann. § 1-4-133(b). As the district court recounted, private groups have already began fundraising and donating posters to effectuate the law. *Stinson v. Fayetteville Sch. Dist. No. 1*, 2025 WL 2231053, at *8 (W.D. Ark. Aug. 4, 2025). This is a "far cry" from the "forced exaction of religious taxes." *Nathan*, 173 F.4th at 602.

***Fourth***, as already discussed, Act 573 does not punish dissenting worship. Both England and the colonies at times restricted religious dissenters from buying or inheriting land, possessing firearms, or serving in the militia—and sometimes even imposed criminal punishment or banishment. McConnell, *Establishment of Religion, supra* at 2159–69.

Here, Act 573 does none of these things. "If students disagree with the Commandments or ignore them or laugh at them, [Act 573] imposes neither penalty nor sanction, formal or informal." *Nathan*, 173 F.4th at 601. If anything, the Act attempts to accommodate diverse religious views by "amalgamat[ing] … Jewish, Protestant, and Catholic versions" of the text of the Ten Commandments. *Books*, 235 F.3d at 296. And other Arkansas laws forbid the State from discriminating against any religious organization or belief. *See, e.g.*, Ark. Code Ann. § 16-123-503(a).

*Fifth*, Act 573 does not restrict political participation based on religion. In England, the Test and Corporation Acts required subjects seeking to hold positions in "civil, military, academic, or municipal office" to receive communion in the Church of England and swear an oath against the Catholic doctrine of transubstantiation. McConnell, *Establishment of Religion*, *supra* at 2176. And in many American colonies, political office was open only to Protestants and closed to Catholics, non-Trinitarians, Jews, and atheists. *Id.* at 2178.

Here, on the other hand, Act 573 has nothing to do with political participation at all. Teachers, parents, and students who disagree with the law or the messages contained in the Ten Commandments may participate fully in the State's political and legal processes—including by bringing this lawsuit and advocating for the repeal of Act 573.

*Sixth*, Act 573 does not delegate a monopoly over government functions to a church. Both in England and many colonies, social welfare programs, education, marriage, and certain prosecutions were delegated to the state church, often to the exclusion of others. McConnell, *Establishment of Religion*, *supra* at 2169–76.

Here, Act 573 does not delegate any civic function to a religious body.[5]

In short, Act 573 is not the sort of religious establishment that anyone in the founding generation was concerned about when they ratified the First Amendment. This should come as no surprise in light of the "unbroken history" of religious symbolism in public places. *Shurtleff*, 596 U.S. at 287 (Gorsuch, J., concurring). The Court should reverse the district court's contrary conclusion.

**C.     The District Court Erred By Applying The Abrogated *Lemon* Test.**

The district court reached that contrary conclusion only by misapprehending the governing law. Though the Supreme Court in *Kennedy* "instructed that the Establishment Clause must be interpreted by reference to historical practices and understandings," 597 U.S. at 535, the district court instead applied an ahistorical precedent decided under the now-abrogated *Lemon* test. *Stinson*, 2026 WL 736964, at *7.

In *Lemon v. Kurtzman*, the Supreme Court "attempted a 'grand unified theory' for assessing Establishment Clause claims." *Kennedy*, 597 U.S. at 534

---

[5] Though the Establishment Clause prohibits a State from handing its civic authority to an established church, the Free Exercise Clause ensures that religious organizations can participate in civic life and government programs on equal footing with secular organizations. *See, e.g.*, *Fulton v. City of Phila.*, 593 U.S. 522, 542 (2021) (foster care); *Carson*, 596 U.S. at 789 (education).

(quoting *Am. Legion*, 588 U.S. at 60). *Lemon* established a three-prong test, requiring all laws to (1) "have a secular legislative purpose," (2) "neither advance[] nor inhibit[] religion," and (3) "not foster an excessive government entanglement with religion." 403 U.S. at 612–13. "The Court later elaborated that the 'effect[s]' of a challenged action should be assessed by asking whether a 'reasonable observer' would conclude that the action constituted an 'endorsement' of religion." *Am. Legion*, 588 U.S. at 49 (quoting *Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 630 (1989) (O'Connor, J., concurring in judgment)).

A few years after *Lemon*, the Court took up a challenge to "[a] Kentucky statute requir[ing] the posting a copy of the Ten Commandments, purchased with private contributions, on the wall of each public classroom in the State." *Stone*, 449 U.S. at 39. In a four-page *per curiam* opinion, decided "without benefit of oral argument or briefs on the merits," *id.* at 47 (Rehnquist, J., dissenting), the Court held only that the Kentucky law flunked *Lemon*'s purpose prong. Kentucky argued that the poster "serve[d] a secular legislative purpose" because the Ten Commandments serve "as the fundamental legal code of Western Civilization and the Common Law of the United States." *Id.* at 41. But the Court labeled this secular purpose "self-serving." *Id.* "If the posted copies of the Ten Commandments are to have any

effect at all," the Court reasoned, "it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments." *Id.* at 42. And, the Court noted, "[t]he Commandments do not confine themselves to arguably secular matters, such as honoring one's parents, killing or murder, adultery, stealing, false witness, and covetousness," but also discuss "the religious duties of believers." *Id.* at 41–42. The Court concluded that the State could not "support" such statements, and set aside the Kentucky law. *Id.* at 42.

The district court concluded that—because of its factual similarity—this case is governed by *Stone*. *See Stinson*, 2026 WL 736964, at *7. That was an error. To begin, *Stone* decidedly *did not* announce a categorical rule against any Ten Commandments display in public schools. Rather, it simply held that Kentucky's Ten Commandments monuments were unconstitutional based on the court's analysis of the statute's purpose under *Lemon*'s purpose prong. *Stone*, 449 U.S. at 41. To follow *Stone*, then, did not entail applying a squarely on-point holding; it required the district court to apply *Lemon*'s purpose prong to Act 573. *See* Stephanie Barclay, *The Ten Commandments Return to Federal Court*, SCOTUSBlog (Jan. 23, 2026), https://tinyurl.com/yc8ebwb4. The district court's opinion illustrates as much. Like *Stone*, it asks whether Arkansas had a "plausible secular purpose"

for adopting the law. *Stinson*, 2026 WL 736964, at *8-9. And like *Stone*, it scoffs at the State's proffered motives, concluding that "the only reason to display a sacred, religious text in every classroom is to proselytize to children." *Id.* at *9; *see also Van Orden*, 545 U.S. at 691 n.11 (plurality op.) (explaining that *Stone* turned on "religious purpose").

But the *Lemon* test upon which *Stone* rested was "long ago abandoned," taking the methodology utilized by *Stone* with it. *Kennedy*, 597 U.S. at 534. Indeed, the process of abandonment began not long after *Lemon* was handed down. "As Establishment Clause cases involving a great array of laws and practices came to the Court, it became more and more apparent that the *Lemon* test could not resolve them." *Am. Legion*, 588 U.S. at 49. Public displays of religion were particularly ill-suited to the "neat checklist" *Lemon* provided. *Shurtleff*, 596 U.S. at 277 (Gorsuch, J., concurring). That checklist "could not 'explain the Establishment Clause's tolerance, for example, of the prayers that open legislative meetings, certain references to, and invocations of, the Deity in the public words of public officials; the public references to God on coins, decrees, and buildings; or the attention paid to the religious objectives of certain holidays, including Thanksgiving.'" *Am. Legion*, 588 U.S. at 49 (quoting *Van Orden*, 545 U.S. at 699 (Breyer, J., concurring in judgment)) (citation modified). Courts were thus left to make

"case-specific examinations of the challenged government action" with no "articulable standards." *Allegheny*, 492 U.S. at 623 (O'Connor, J., concurring in judgment).

In an increasing number of cases, therefore, the Court turned to history to supply the standard. Take the example of legislative prayer. Just three years after *Stone*, the Court upheld Nebraska's practice of beginning each legislative day with prayer. *Marsh v. Chambers*, 463 U.S. 783 (1983). Canvassing history "[f]rom colonial times through the founding of the Republic and ever since," the Court concluded that legislative prayer is "deeply embedded in the history and tradition of this country." *Id.* at 786. This "unbroken practice" gave the Court "abundant assurance that" the prayer posed no constitutional "threat." *Id.* at 795. And thirty years later, the Court reaffirmed the permissibility of legislative prayer in *Town of Greece v. Galloway*, emphasizing that any Establishment Clause inquiry "must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." 572 U.S. at 577.

Religious monuments provide another example where history, rather than anything stated in *Lemon*, directed the outcome. In *Van Orden v. Perry*, a plurality of Justices concluded that *Lemon* was "not useful" to resolve challenges to religious monuments and instead looked to history to uphold

the constitutionality of a monument displayed near the Texas capitol bearing the Ten Commandments. 545 U.S. at 686 (plurality op.). The plurality acknowledged that "the Ten Commandments are religious," but rejected the notion that "[s]imply having religious content or promoting a message consistent with religion" ran "afoul of the Establishment Clause." *Id.* at 690. And a decade later, in *American Legion*, the Court sounded the death knell for *Lemon* in public symbol cases, emphasizing the presumptive constitutionality of longstanding religious monuments or displays. 588 U.S. at 51–54.

Accordingly, when the Court in *Kennedy* proclaimed *Lemon*'s demise three years later, it was simply confirming what these earlier cases had already made apparent: lower courts should not apply the reasoning of *Lemon*, or rely on any "progeny" of *Lemon*, unless the decision is also consistent with a historically rooted approach to the Establishment Clause. *Kennedy*, 597 U.S. at 534, 535 n.4, 541–42; *see also Kennedy v. Bremerton Sch. Dist.*, 4 F.4th 910, 945–46 (9th Cir. 2021) (R. Nelson, J., dissenting from denial of en banc review) (explaining that in light of the death of *Lemon*, lower courts must not extend precedents reliant on *Lemon*) (cited approvingly in *Kennedy*, 597 U.S. at 535 n.4).

Nor does "*Kennedy*'s treatment of Establishment Clause precedent …

somehow preserv[e] *Lemon* for certain cases." *Nathan*, 173 F.4th at 592. The

district court reasoned that *Kennedy* had "cited favorably" two cases, *Lee v.

Weisman*, 505 U.S. 577 (1992), and *Santa Fe Independent School District v.

Doe*, 530 U.S. 290 (2000), which (according to the district court) also "relied

on *Lemon.*" *Stinson*, 2026 WL 736964, at *7. But that is not a "plausible"

reading of *Kennedy*. *Nathan*, 173 F.4th at 592. *Lee* and *Santa Fe* both "cited"

*Lemon*, but *Kennedy* "explicitly frames" both as "coercion case[s] and says

nothing about *Lemon.*" *Id.*; *see also Am. Legion*, 588 U.S. at 70 (Kavanaugh,

J., concurring) (explaining that "*Lemon* was not necessary to the Court's

decisions holding government-sponsored school prayers unconstitutional,"

and that "[t]he Court's most prominent case on that subject, *Lee v. Weisman*,

did not rely on *Lemon*" at all (citation omitted)). [6]

In short, the district court erred by "exhum[ing] *Lemon*" "[u]nder the

guise of applying *Stone.*" *Nathan*, 173 F.4th at 593. Courts "do not have the

---

[6] Indeed, *Kennedy* contrasts sharply with *Loper Bright Enterprises v. Raimondo*, in which the Court took pains to preserve the "holdings" of "prior cases that relied on the *Chevron* framework." 603 U.S. 369, 412 (2024). If *Kennedy* had intended to preserve the holdings of all cases decided under *Lemon* while merely substituting a new test going forward, it would have said so—as *Loper Bright* did.

option of ignoring the Supreme Court's express directives" to look to history rather than abrogated precedent. *Id.* at 592.

## II.  Act 573 Does Not Violate The Free Exercise Clause.

Act 573 is fully consistent with the Free Exercise Clause as well. The Free Exercise Clause "protects against indirect coercion or penalties on the free exercise of religion." *Carson*, 596 U.S. at 778. This includes actions that constitute undue "interference with voluntary religious choice." Stephanie H. Barclay, *Replacing Smith*, 133 YALE L.J. FORUM 436, 451 (2023). This can occur by the government "making [the religious exercise] more costly—by imposing penalties or denying government benefits," or through more direct means, such as by making "that voluntary choice impossible, rather than costly." *See id.*

In the context of public education, the Free Exercise Clause prevents laws which "substantially interfere[]" with parents' ability to direct their children's "religious development." *Mahmoud*, 606 U.S. at 550. That is because the role of parents in guiding the "religious future of the child" is "an enduring American tradition," *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972), and the State has never held the power "to standardize its children" contrary to parents' wishes, *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925).

Thus, in *West Virginia State Board of Education v. Barnette*, the Supreme Court affirmed the right of Jehovah's Witness children to opt-out of a flag salute at the beginning of class because participation in the salute violated the faith commitments in which their parents were raising them. 319 U.S. 624, 634–35 (1943). Several decades later, the Court in *Wisconsin v. Yoder* likewise exempted Amish families from a compulsory education law that would have required Amish children to attend school "in an environment hostile to Amish beliefs," thereby hindering the child's "integration … into the Amish religious community." 406 U.S. at 211–12.

More recently, in *Mahmoud v. Taylor*, the Court held that a Maryland school district violated the Free Exercise Clause when it forbade parents from opting their children out of a "LGBTQ+-inclusive" curriculum that involved active "instruction" aimed at "disrupt[ing] children's thinking about sexuality and gender." 606 U.S. at 529. The County had set "an expectation that teachers use" LGBTQ+ storybooks "as part of instruction," and that "discussion" would "ensue" after reading the books to "correct the children and accuse them of being hurtful" if they "express[ed] a degree of religious confusion." *Id.* at 555. If the parents did not wish their children to participate, they were forced either to withdraw their child from school altogether or to allow their religious exercise to be violated. *Id.* at 553–54.

The Court concluded that this government action constituted an "objective danger" to the sincerely held religious exercise. *Id.* at 546.

What each decision reflects—and what the Free Exercise Clause itself reflects—is a concern with government action that exerts significant pressure on religious believers to assent, practice, or engage in exercise contrary to a sincerely held religious belief. That is why the Court emphasized in *Mahmoud* that the curriculum at issue went "far beyond mere exposure," and that parents did not have a "right to micromanage" the curriculum if they simply disagreed with its content. *Id.* at 556, 568. Indeed, the parents specifically disclaimed a challenge to "the books being on the shelf or available in the library without a teacher requiring [students] to read [the books]." Transcript of Oral Argument at 48, *Mahmoud v. Taylor*, 606 U.S. 522 (2025) (No. 24-297). And that is why in *Barnette*, the Court did not ban the Pledge of Allegiance from schools altogether, finding no constitutional burden on students sitting through its recitation. 319 U.S. at 634. All to say— the Court's decisions confirm that the mere *presence* of symbols, texts, or materials antithetical to a family's religious views does not create a problem under the Free Exercise Clause. To the contrary, "learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society.'" *Kennedy*, 597 U.S. at 538.

Here, nothing required by Act 573 exceeds the boundaries set by the Free Exercise Clause. Placing the Ten Commandments between posters containing the Pledge of Allegiance, lines from Emerson or Thoreau, exhortations from Dr. King or Gandhi, or amorphous encouragement that students "Dream Big" or "Believe in Yourself" hardly imposes "psychological pressure to conform"—at least no more than would reproduction of the Ten Commandments in a history textbook. *Mahmoud*, 606 U.S. at 554. Students are not forced to engage with the Ten Commandments, let alone recite them as an article of faith. *Contra Barnette*, 319 U.S. at 634. And "[t]eachers are not required or encouraged to offer religious reflections on the Ten Commandments," "proselytize students who ask about the displays," or "instruct[] … atheist, nontheist, polytheist, or agnostic students" that "their beliefs are 'hurtful.'" *Nathan*, 173 F.4th at 609. Act 573 accordingly is fully consistent with the free religious exercise of students and parents protected by the Free Exercise Clause.

Indeed, accepting the plaintiffs' free exercise claim in this case would result in exactly what *Mahmoud* rejected: parental micromanagement of the public school curriculum. 606 U.S. at 568. Among other things, that would allow objecting students not just to sit quietly while the Pledge of Allegiance is recited, but to stop others from reciting. It would allow students or their

29

parents to seek to ban kosher or halal food from school cafeterias because they object to its presence on religious grounds. Or parents could scrutinize the posters in a science classroom for references to the theory of evolution inconsistent with their religious commitments. The Free Exercise Clause does not require this unworkable result.

## CONCLUSION

Because Act 573 neither prescribes religious exercise to violate the Establishment Clause nor proscribes religious exercise to violate the Free Exercise Clause, it is consistent with the First Amendment's Religion Clauses. The Court should reverse the permanent injunction.

June 5, 2026

Respectfully submitted,

Eric C. Rassbach
The Hugh & Hazel Darling
Foundation Religious Liberty Clinic
Pepperdine University Caruso
School of Law
24225 Pacific Coast Highway
Malibu, CA 90263
+1.310.506.4611
eric.rassbach@pepperdine.edu

*/s/ Noel J. Francisco*
Noel J. Francisco
  *Counsel of Record*
Hannah L. Templin
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC  20001.2113
+1.202.879.3939
njfrancisco@jonesday.com

Kurt A. Johnson
JONES DAY
150 West Jefferson
Suite 2100
Detroit, Michigan, 48226.4438
+1.313.733.3939

Eric P. Leis
JONES DAY
500 Grant St., Suite 4500
Pittsburgh, PA 15219
+1.412.319.3939

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)–(5) and 32(g)(1), I certify that the foregoing brief contains 6,492 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), as counted using the word-count function on Microsoft Word 365 software.

This brief further complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because this brief has been prepared in a proportionately spaced typeface, 14-point Georgia.

Dated: June 5, 2026                          Respectfully submitted,

                                             */s/ Noel J. Francisco*
                                             Noel J. Francisco

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, I caused the foregoing brief to be electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Eighth Circuit via the CM/ECF system. I further certify that service on all parties' counsel will be accomplished by the CM/ECF system.

Dated: June 5, 2026            Respectfully submitted,

*/s/ Noel J. Francisco*
Noel J. Francisco