# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

SAMANTHA STINSON & JONATHAN STINSON, on behalf of themselves and on behalf of their minor children, A.R.S. & A.W.S., *et al.*,
*Plaintiffs-Appellees*,

JULEE JAEGER, on behalf of herself and on behalf of her minor child, U.J., *et al.*,
*Plaintiffs-Appellees*,

v.

FAYETTEVILLE SCHOOL DISTRICT NO. 1, *et al.*,
*Defendants*,

STATE OF ARKANSAS
*Intervenor-Appellant.*

On Appeal from the United States District Court
for the Western District of Arkansas
No. 5:25-cv-05127, Hon. Timothy L. Brooks

## BRIEF OF NATIONAL COUNCIL OF JEWISH WOMEN ET AL. AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES URGING AFFIRMANCE

Lindsay C. Harrison
*Counsel of Record*
Luke C. Platzer
Noah B. Bleicher
Mary-Claire Spurgin
Amber M. Gibson

JENNER & BLOCK LLP
1099 New York Ave., NW #900
Washington, DC 20001
(202) 639-6000
lharrison@jenner.com

*Attorneys for National Council of Jewish Women, et al. Amici*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................iii

IDENTITY AND INTERESTS OF AMICI .............................................. 1

SUMMARY OF ARGUMENT ..................................................................3

ARGUMENT ..............................................................................................5

A.  The Establishment Clause Protects Adherents of Minority Religions from Pressure to Conform to the Majority Faith. ...........5

B.  The Ten Commandments Are a Fundamentally Religious Text, and the Version Mandated by Act 573 Is Contested..............8

   1.  The Ten Commandments Are an Inherently and Historically Religious Text. ........................................................9

      a.  The Ten Commandments Have Been Integrated Into Religious Traditions and Imagery for Centuries..................10

      b.  Legal Precedent Treats the Ten Commandments as Primarily Religious Text...................................................12

   2.  The King James Version of the Ten Commandments Mandated by Act 573 Reflects Meaningful Differences Among Religions within the Jewish and Christian Traditions....................................................................................13

      a.  Numbering of Commandments...........................................15

      b.  First Commandment.............................................................16

      c.  Second (or First) Commandment........................................18

      d.  Second (or Third) Commandment.......................................18

      e.  Fifth, Sixth, or Eighth Commandment. ..............................19

   3.  The Ten Commandments Are Inconsistent with Many Minority Faiths.....................................................................19

i

C.    The Arkansas Mandate Imposes Practices of a Majority Sect of a Majority Religion. ...................................................................... 21

    1.    School Children Are Particularly Vulnerable to Social Pressure and Isolation. ........................................................... 22

    2.    Act 573 Impedes Parents' Ability to Direct the Religious Upbringing of Their Children. ................................................. 23

CONCLUSION ......................................................................................... 27

Appellate Case: 26-1722    Page: 3    Date Filed: 07/07/2026 Entry ID: 5658457

# TABLE OF AUTHORITIES

**CASES**

*City of Elkhart v. Books*, 532 U.S. 1058 (2001).....................................11

*Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 605 U.S. 238 (2025) ...........................................6

*Kennedy v. Bremerton School District*, 597 U.S. 507 (2022) .............5, 20

*Lee v. Weisman*, 505 U.S. 577 (1992) ..........................................5, 22, 24

*Illinois ex rel. McCollum v. Board of Education of School District No. 71*, 333 U.S. 203 (1948)...........................................22, 23

*Mahmoud v. Taylor*, 606 U.S. 522 (2025) ...........................................25

*McCreary County v. ACLU of Kentucky*, 545 U.S. 844 (2005)............6, 14

*Roake v. Brumley*, 756 F. Supp. 3d 93 (M.D. La. 2024), *aff'd*, 141 F.4th 614 (5th Cir.), *reh'g granted, opinion vacated*, 154 F.4th 329 (5th Cir. 2025) (en banc), *reh'g en banc granted, opinion vacated*, 170 F.4th 292 (5th Cir. 2026).................................20

*School District of Abington Township v. Schempp*, 374 U.S. 203 (1963)................................................................................22, 23

*Stinson v. Fayetteville School District No. 1*, 798 F. Supp. 3d 931 (W.D. Ark. 2025) .........................................................................7

*Stone v. Graham*, 449 U.S. 39 (1980).........................................11, 12, 23

*Van Orden v. Perry*, 545 U.S. 677 (2005)...............................................12

*West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943)..............................................................................................5

**OTHER AUTHORITIES**

Catechism of the Catholic Church §§ 2066, 2070 (1994).................. 10, 13

Appellate Case: 26-1722     Page: 4     Date Filed: 07/07/2026 Entry ID: 5658457

Diarmaid MacCulloch, *The Reformation: A History* (2004) ...................11

Exodus 34:27-28 ............................................................................9, 16

Exodus 34:27-28 (King James Version) ...................................... 15, 17, 18

Fed. R. App. P. 29 ................................................................................1

Noah Feldman, *Non-sectarianism Reconsidered*, 18 J.L. & Politics 65 (2002) .................................................................................14

Paul Finkelman, *The Ten Commandments on the Courthouse Lawn and Elsewhere*, 73 Fordham L. Rev. 1477 (2005)......................................................................... 13, 17, 18, 19

Frederick Mark Gedicks & Roger Hendrix, *Uncivil Religion: Judeo-Christianity and the Ten Commandments*, 110 W. Va. L. Rev. 275 (2007).................................................. 12, 17

Lester L. Grabbe, *A History of the Jews and Judaism in the Second Temple Period* 217, 284 (T&T Clark Int'l 2004) .......................9

James Madison, *Memorial and Remonstrance Against Religious Assessments* (1785) (collected in *Selected Writings of James Madison* 21 (Ralph Ketcham ed., 2006))................6

Patrick D. Miller, *The Ten Commandments* 1 (2009)...................... 10, 11

Mishnah Tamid 5:1 .............................................................................9

W. Gunther Plaut, *The Torah: A Modern Commentary to Exodus* 220 (1983)......................................................................... 10, 16

Qur'an 4:154, 2:255, 6:160.................................................................19

*Religious Landscape Study*, Pew Rsch. Ctr., https://www.pew research.org/religious-landscape-study/database/state/ Arkansas/ (last visited June 22, 2026) ...............................................20

G.B. Sarfati, *The Tablets as a Symbol of Judaism*, in *The Ten Commandments in History and Tradition* 383-85 (Ben-Tsiyon Segal & Gershon Levi eds., 1990)...........................................10

Appellate Case: 26-1722    Page: 5    Date Filed: 07/07/2026 Entry ID: 5658457

*Ten Commandments*, Catholic Encyc., https://www.new advent.org/cathen/04153a.htm (last visited June 22, 2026)..............10

Appellate Case: 26-1722    Page: 6    Date Filed: 07/07/2026 Entry ID: 5658457

# IDENTITY AND INTERESTS OF AMICI[1]

*Amici curiae* are organizations, representing or affiliated with a range of religious traditions, that affirm the right of individuals to freely choose and practice their religion without government interference.

National Council of Jewish Women ("NCJW") is a grassroots organization composed of volunteers and advocates dedicated to the pursuit of equity and justice through a powerful combination of community organizing, education, direct service, and advocacy. We carry with us the tradition of safeguarding the individual rights of freedoms for women, children, and families. United by our Jewish values, we mobilize our network of 43 local sections and over 250,000 advocates to make this vision a reality at all levels of government and in communities across the United States.

The additional *amici* are faith-based organizations that espouse a wide range of religious traditions and beliefs:

- American Jewish Committee

---

[1] All parties consent to the filing of this brief. No party's counsel authored this brief in whole or in part, and no money intended to fund preparing or submitting this brief was contributed by a party or party's counsel or anyone other than *amici*, their members, or their counsel. *See* Fed. R. App. P. 29.

Appellate Case: 26-1722    Page: 7    Date Filed: 07/07/2026 Entry ID: 5658457

- Bend the Arc: A Jewish Partnership for Justice
- Central Conference of American Rabbis
- Hadassah, The Women's Zionist Organization of America, Inc.
- Hindus for Human Rights
- Interfaith Alliance
- Jewish Council for Public Affairs
- Jewish Women International
- Keshet
- Men of Reform Judaism
- Muslim Public Affairs Council Foundation
- Muslims for Progressive Values
- Rabbinical Assembly
- Reconstructing Judaism
- Reconstructionist Rabbinical Association
- Sadhana: Coalition of Progressive Hindus
- The Sikh Coalition
- Society for Humanistic Judaism
- T'ruah
- Union for Reform Judaism
- Women of Reform Judaism
- Women's Rabbinic Network
- Zioness Movement

Together representing a diverse array of faiths both within and outside of the Judeo-Christian traditions, *amici* offer a perspective shared by millions of Americans on how the posting of the Ten Commandments in Arkansas classrooms would impact students and families from minority faith communities. *Amici* also offer perspective on

2

Appellate Case: 26-1722    Page: 8    Date Filed: 07/07/2026 Entry ID: 5658457

the different meanings, interpretations, and understandings of the Ten Commandments within the Jewish and Christian traditions, highlighting how the Arkansas statute at issue here has the effect of endorsing an interpretation of those Commandments that is not universally shared.

## SUMMARY OF ARGUMENT

*Amici* write in support of Plaintiffs, and in support of affirmance of the district court ruling, to provide this Court with additional context regarding the historical and religious significance of the Ten Commandments within different faith traditions, and to explain how Act 573 would affect members of religious communities outside the majority Protestant Christian tradition.

The Founding Fathers envisioned the Establishment Clause as a bulwark against religious favoritism, including the protection for adherents of minority religions (as well as non-believers) from pressures to conform to the majority faith. Those pressures, and related persecution, had plagued many European nations at the time.

Contrary to the Founders' intent, Act 573 would put the government in the position of favoring certain religious traditions over

3

others. Although the Ten Commandments are historically significant, they are inherently a religious text with different meanings, interpretations, and significance across different faiths, including within and among faiths within the Jewish and Christian traditions. Differences among religious faiths in how the Commandments are worded, and which text is included, represent meaningful and important elements of the religious beliefs of several faiths and denominations. Act 573, however, would privilege the language for the Ten Commandments observed by some Protestant Christians, which is not shared within Jewish or even certain other Christian denominations.

More broadly, whether students subscribe to a faith that observes some version of the Ten Commandments or not, centering the text as an object of veneration—as Act 573 would do—would pressure students from faiths other than the majority Protestant Christian religion into conforming to the beliefs of the majority faith, impeding parents' interest in directing the religious upbringing of their children, and running counter to the Establishment Clause's text and historic intent. For that reason, *Amici* urge the Court to affirm.

4

Appellate Case: 26-1722     Page: 10     Date Filed: 07/07/2026 Entry ID: 5658457

# ARGUMENT

## A. The Establishment Clause Protects Adherents of Minority Religions from Pressure to Conform to the Majority Faith.

One of the animating purposes behind the Establishment Clause was to protect all Americans—particularly adherents of minority religions—from pressures to conform to the majority faith. The Supreme Court has advised that the permissibility of government action under the Establishment Clause should look to, *inter alia*, whether it "accord[s] with history and faithfully reflec[ts] the understanding of the Founding Fathers." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535-36 (2022) (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014) (citation omitted)); *see also id.* at 535 ("[T]he Establishment Clause must be interpreted by 'reference to historical practices and understandings.'"). Among those "historical . . . understandings" was the desire to protect religious liberty from the danger posed by the government choosing among different faiths and pressuring members of other faith communities to conform.

The Founders understood that to "'make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary,' the government must not align itself with any one of them." *Lee v. Weisman,*

5

Appellate Case: 26-1722    Page: 11    Date Filed: 07/07/2026 Entry ID: 5658457

505 U.S. 577, 608 (1992) (Blackmun, J., concurring) (citation omitted). Indeed, the Establishment Clause is rooted, in part, in an understanding of the importance of protecting adherents of minority religions against the imposition of majority-faith beliefs. *See W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 638 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts."); *see also McCreary Cnty. v. ACLU of Ky.,* 545 U.S. 844, 884 (2005) (O'Connor, J., concurring) ("It is true that many Americans find the Commandments in accord with their personal beliefs. But we do not count heads before enforcing the First Amendment."). In fact, the Supreme Court has reiterated that the Founders intended for the "clearest command of the Establishment Clause" to embody the principle "that the government may not 'officially prefer' one religious denomination over another." *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n,* 605 U.S. 238, 247 (2025) (quoting *Larson v. Valente,* 456 U.S. 228, 244 (1982)) (alteration omitted).

Appellate Case: 26-1722    Page: 12    Date Filed: 07/07/2026 Entry ID: 5658457

Further, James Madison, writing in opposition to a bill in the Virginia General Assembly proposing to levy a tax in support of teachers of religion, explained:

> The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate . . . . Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects? That the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever?

James Madison, *Memorial and Remonstrance Against Religious Assessments* (1785) (collected in *Selected Writings of James Madison* 21 (Ralph Ketcham ed., 2006)). As expert Steven K. Green noted in his submitted report to the district court, no individual had a greater impact on the First Amendment's enactment than did James Madison. R. Doc. 8, Ex. 12, at 11. More, to Thomas Jefferson, "a mere governmental 'recommendation' of religious practice, even without the backing of legal force, was no 'less a law of conduct for those to whom it is directed.'" *Id.* at 12. (internal citation omitted). In an earlier opinion, the district court noted Madison's warning that Americans should "take alarm at the first experiment on [their] liberties," observing that such an experiment is

7

Appellate Case: 26-1722     Page: 13     Date Filed: 07/07/2026 Entry ID: 5658457

presently being conducted in Arkansas and elsewhere. *Stinson v. Fayetteville Sch. Dist. No. 1*, 798 F. Supp. 3d 931, 936-37 (W.D. Ark. 2025) (quotation marks omitted).

## B.   The Ten Commandments Are a Fundamentally Religious Text, and the Version Mandated by Act 573 Is Contested.

The Ten Commandments are, first and foremost, a religious text. While many religious groups within the Jewish and Christian traditions recognize some version of the Commandments as a significant religious text, the specific wording of what the Commandments require and what they prohibit—as well as their meaning and significance—vary meaningfully even within those faith traditions. By mandating the posting in every school classroom of the specific version of the Commandments recognized by many Protestant Christians (the King James Version[2]), Act 573 puts the government in the position of choosing sides in meaningful religious differences among and between Jewish and Christian faith communities.

The Ten Commandments' religious history, when divorced from additional educational context, undermines any claim that Act 573 can

___

2   The text mandated by Act 573 derives from the King James Version of the Bible but is a shortened form of what is present in Exodus.

8

be justified with reference to the Ten Commandments' historical or educational significance. Whatever historic secular significance the Commandments may have acquired distinct from their religious origins, Act 573 requires the Commandments to be posted in their entirety, untethered from integration into any curriculum or lesson plan that would reference or invoke their role in history or legal tradition. This requirement to post a particular version of the Commandments continuously and ubiquitously signals to students that their school views those Commandments as beliefs to be honored and rules to obey, and not just a historic document to learn about. It thus (a) involves the government in endorsing what is fundamentally a religious text that is not followed by members of many faith traditions; (b) and even among students who are members of Jewish and Christian denominations that recognize some version of the Ten Commandments, creates pressure to venerate a distinctly different version from the text observed by the students' religious communities.

1. <u>The Ten Commandments Are an Inherently and Historically Religious Text.</u>

The Ten Commandments, or the Decalogue, are an inherently and historically religious text. The continuous placement of the text in public

9

school classrooms, without any integration into a curriculum that focuses on the role they have played in history or the development of legal tradition, thus inherently sends a message to students, regardless of their faiths, that their school views the text as something that should be an object of veneration and reflection, if not obedience.

### a. *The Ten Commandments Have Been Integrated Into Religious Traditions and Imagery for Centuries.*

The extent to which the Ten Commandments are woven into religious traditions and imagery illustrates the text's inherent religious nature and historical understanding as such. The Commandments are a significant part of both the Jewish and Christian traditions.

In Judaism, the Ten Commandments are the text reflecting God's Covenant with Israel—a fundamental principle and recurring theme of Judaism. *See* W. Gunther Plaut, *The Torah: A Modern Commentary to Exodus* 220 (1983) ("The Ten Commandments are rooted in the covenant relationship"); *see also* Exodus 34:27-28. As an illustration of the longstanding significance of the text to Judaism, the Ten Commandments were recited daily in the Second Temple—over 2,000 years ago—as part of the morning prayer. *See* Mishnah Tamid 5:1; Lester

10

L. Grabbe, *A History of the Jews and Judaism in the Second Temple Period* 217 (T&T Clark Int'l 2004).

Today, many synagogues display the Ten Commandments inscribed above the sacred Ark housing the Torah. Further, the Ten Commandments are a central theme of Shavuot, and they are often read aloud in synagogues around the world on that holiday. *See* G.B. Sarfati, *The Tablets as a Symbol of Judaism*, *in The Ten Commandments in History and Tradition* 383-85 (Ben-Tsiyon Segal & Gershon Levi eds., 1990). Indeed, Shavuot is a holiday that, for Jews, celebrates the giving of the Torah to Moses on Mount Sinai. *See id.*

For many Christians, in contrast to Jewish tradition, the Ten Commandments are thought to represent universal commands for all of mankind, and "to embody God's will for human life" as much as any other text or teaching. Patrick D. Miller, *The Ten Commandments* 1 (2009). Within the Catholic tradition, they form the basis for the concept of sacred natural law. *Catechism of the Catholic Church* § 2070, at 502-03 (1994). The Catholic Council of Trent "condemn[ed] those who deny that the Ten Commandments are binding on Christians." *Ten Commandments*, Catholic Encyc., https://www.newadvent.org/cathen/

11

04153a.htm (last visited June 22, 2026). In the Lutheran and Calvinist traditions, too, the Commandments are seen as "universal, eternal law." Miller, *supra*, at 2. After the Reformation, Protestant churches began to include singing or reading of the Ten Commandments after confession, "as a guide to living according to God's instruction." Miller, *supra*, at 11. Also in reformed Protestant churches, Biblical texts, including the Commandments, replaced the images of saints that are common in the Catholic tradition. Diarmaid MacCulloch, *The Reformation: A History* 541 (2004). The Commandments have thus been foundational to Christian worship and practice for centuries, but with understood religious meanings that differ from their understanding within the Jewish faith.

> b. *Legal Precedent Treats the Ten Commandments as Primarily Religious Text.*

The historical understanding of the Ten Commandments as a fundamentally religious text is firmly entrenched and memorialized in our Nation's legal precedent. As the Supreme Court has recognized, the Ten Commandments do not address only "secular matters." *Stone v. Graham*, 449 U.S. 39, 41 (1980). Instead, they establish "the religious duties of believers." *Id.* at 42; *City of Elkhart v. Books*, 532 U.S. 1058,

Appellate Case: 26-1722    Page: 18    Date Filed: 07/07/2026 Entry ID: 5658457

1061 (2001) (Rehnquist, C.J., dissenting in denial of certiorari). The Supreme Court has confirmed that "[t]he Ten Commandments are undeniably a sacred text . . . and no legislative recitation of a supposed secular purpose can blind us to that fact." *Stone*, 449 U.S. at 41. Specifically, the Commandments prohibit "unbelief, polytheism, the worship of icons and images, blasphemy, coveting, Sabbath-breaking, parental disrespect, and adultery"—the realm of religious, not secular, law. Frederick Mark Gedicks & Roger Hendrix, *Uncivil Religion: Judeo-Christianity and the Ten Commandments*, 110 W. Va. L. Rev. 275, 294 (2007).

Since "[a]ttempts to secularize what is unquestionably a sacred text defy credibility and disserve people of faith," this Court should again acknowledge that the Ten Commandments are, and always have been, key religious text. *Van Orden v. Perry*, 545 U.S. 677, 717 (2005) (Stevens, J., dissenting).

2. <u>The King James Version of the Ten Commandments Mandated by Act 573 Reflects Meaningful Differences Among Religions within the Jewish and Christian Traditions.</u>

As noted above, while the Ten Commandments are viewed as significant within a wide number of faith traditions, there are

13

Appellate Case: 26-1722    Page: 19    Date Filed: 07/07/2026 Entry ID: 5658457

consequential differences in the meanings and significance ascribed to them. Those differences extend to the text of the Commandments themselves. Act 573's requirement to post the text of the Commandments in public school classrooms thus inherently involves the government in picking sides among these different traditions, on issues of religious significance.

Act 573 does not mandate the posting of a non-sectarian or nondenominational version of the Ten Commandments—it cannot, because there is no such thing. Rather, "any display of the Commandments is inherently sectarian, because it must choose a translation, ordering, and numbering system that will favor[ ] one or more religions, and therefore disfavor other religions." Paul Finkelman, *The Ten Commandments on the Courthouse Lawn and Elsewhere*, 73 Fordham L. Rev. 1477, 1479 (2005). Act 573, specifically, requires the posting of a particular rendition of the Decalogue: the King James Version of the Ten Commandments, which is observed by many Protestant Christians but differs from the versions observed by members of the Jewish faith and Catholics. *See Catechism* § 2066 (noting that the Catholic Church follows the division of the Commandments established

14

by St. Augustine while "Reformed communities" adhere to a different division); *see also McCreary,* 545 U.S. at 909 n. 12 (J. Scalia, dissenting) (noting that "there are interpretational differences between faiths and within faiths concerning the meaning and perhaps even the text of the Commandments").

The public endorsement and display of one version of the Decalogue is thus to the detriment of others. *See, e.g.,* Noah Feldman, *Non-sectarianism Reconsidered*, 18 J.L. & Politics 65, 85 (2002) (noting that Catholics may view the King James Version as a symbol of the "Protestant tradition of anti-Catholicism"). In particular, faith traditions differ with respect to which text is included within the Commandments, how they are numbered, and how they are worded, and those discrepancies reflect meaningful religious differences across faith groups.

>  a. *Numbering of Commandments.*

The numbering system for the relevant verses of the Torah and Bible differs between versions. As discussed below, the Jewish Torah and Christian Bibles each contain different formulations of the First and Second Commandments, which, in turn, impacts the numbering scheme. The Jewish and King James translations of Exodus employ the same

15

Appellate Case: 26-1722     Page: 21     Date Filed: 07/07/2026 Entry ID: 5658457

numbering for the third through tenth Commandments. The Catholic and Lutheran versions use a different one. Finkelman, *supra*, at 1488 (citing *The Torah: A Modern Commentary* (W. Gunther Plaut ed., Union of American Hebrew Congregations 1981) (1962) ("[W]e cannot conclude from the text itself what comprises the first commandment, what the second, and so forth.")). These differences give rise to varying interpretations of the Decalogue. *E.g.*, Finkelman, *supra*, at 1488 ("[A]n admonition from a Catholic to 'remember the Seventh Commandment' (don't steal) would have a very different meaning for a Protestant or a Jew (don't commit adultery).").

> b. *First Commandment.*

In the Christian Bible, including the King James Version, the First Commandment is "Thou shalt have no other gods *before* Me." Exodus 20:3 (King James Version) (emphasis added and the Lutheran catechism directs, "You shall have no other gods"). Moreover, the Torah labels this as the Second, not First, Commandment.

Additionally, the first Jewish Commandment consists of the statement, "I the LORD am your God who brought you out of the land of Egypt, the house of bondage." Plaut, *The Torah, supra*, at 539. This

16

Appellate Case: 26-1722     Page: 22     Date Filed: 07/07/2026 Entry ID: 5658457

differs from the Christian Bible (including the King James Version and Catholic and Lutheran translations), which incorporates that identification into the prohibition on polytheism. *See* Exodus 20:2-3.

This distinction is meaningful because the omitted text frames the Jewish understanding of the Commandments as God's Covenant with the Israelites: it suggests that the Commandments were directed towards the Israelites, who shared a historical experience of oppression and suffering, and of subsequent redemption. *See* R. Doc. 8, Ex. 12, at 29 (describing this language as a "critical recognition" of Jews' "special relationship and covenant with God" and explaining how "erasing this text may be considered deeply offensive" as a spiritual matter). This understanding is a critical and recurring theme in Judaism—so much so that displaying the First Commandment *without* the prologue violates the intent of the Jewish Commandments by divorcing it from its key context. *Id.*

There are therefore at least separate Jewish and Christian versions of the First Commandment, and any public posting of the Decalogue inherently involves the government in endorsing one of those interpretations over the others.

17

### c. *Second (or First) Commandment.*

The Second Commandment also underscores differences between interpretations of the Decalogue. In the King James Version, the Second Commandment is a prohibition on "graven image[s]." Exodus 20:4 (King James Version). In the Jewish, Catholic, and Lutheran versions of Exodus, on the other hand, that prohibition is not a separate commandment. *See* Finkelman, *supra*, at 1486. And the Catholic directive, to "not carve idols," has a different meaning from the King James Version's ban on all "graven images." *Id.* at 1494. The King James Version, in fact, would prohibit the veneration of icons, a practice which is common in Catholic and Eastern Orthodox traditions. Gedicks & Hendrix, *supra*, at 297. Additionally, as noted above, the statement, "You shall have no other gods before Me" is part of the Jewish Second—not First—Commandment.

### d. *Second (or Third) Commandment.*

Next, the Commandment regarding the use of God's name takes on different meanings across faiths. The King James version of the Bible instructs that "[t]hou shalt not take the name of the LORD thy God in vain." Exodus 20:7 (King James Version). Some Jewish translations

18

interpret this command as "You shall not swear falsely by the name of the LORD your God." Finkelman, *supra*, at 1496-97. This difference is not merely semantic: the Jewish interpretation focuses on a perjury-like use of God's name, whereas the King James Version sweeps more broadly and may include swearing. *Id.*

e.   *Fifth, Sixth, or Eighth Commandment.*

Finally, the King James Version of the Bible contains a verse that "[t]hou shalt not kill." Exodus 20:13 (King James Version). Jewish translations, on the other hand, translate this command as "[y]ou shall not murder." Finkelman, *supra*, at 1495. This is a substantive discrepancy that has been invoked in contentious political issues like abortion access, opposition to capital punishment, and conscientious objection to military service. *Id.* Again, the differences in interpretations of the Decalogue are not merely semantic, but bear upon meaningful and significant religious questions, and Act 573 places the government in the position of endorsing one set of religious beliefs over others.

3.   The Ten Commandments Are Inconsistent with Many Minority Faiths.

The Ten Commandments hold no significance in many faith traditions; indeed, some of their directives openly forbid the practice of

19

other religions. In Islam, for example, the Qur'an recognizes the Commandments but does not treat them as important. *See* Qur'an 4:154, 2:255, 6:160. Additionally, atheists and followers of non-Judeo-Christian religions like Hinduism, Buddhism, Shintoism, Confucianism, Jainism, Taoism, and Native American faiths, *cannot* ascribe to the Commandments. *See Roake v. Brumley*, 756 F. Supp. 3d 93, 191-192 (M.D. La. 2024), *aff'd*, 141 F.4th 614 (5th Cir.), *reh'g granted, opinion vacated*, 154 F.4th 329 (5th Cir. 2025) (en banc), *reh'g en banc granted, opinion vacated*, 170 F.4th 292 (5th Cir. 2026). The Commandment that "[t]hou shalt have no other Gods before me," for example, cannot apply to a polytheistic religion or to a worldview that does not recognize gods. Finkelman, *supra*, at 1499. By the same token, the instruction to "remember the Sabbath day and keep it holy" has no import to the millions of Americans who do not observe a Sabbath. *Id.*

The Supreme Court noted in *Kennedy* that there is "[n]o historically sound understanding of the Establishment Clause that . . . 'mak[es] it necessary for government to be hostile to religion,'" *Kennedy*, 597 U.S. at 541 (citing *Zorach v. Clauson*, 343 U.S. 306, 314 (1952)), and that "[r]espect for religious expressions is indispensable to life in a free and

20

diverse Republic . . . ." *Id.* at 543. This directive cuts both ways: precisely because the Ten Commandments are a religious text containing directives that differ from (and are inconsistent with) the precepts of some minority faiths, a requirement that they be posted in every public school classroom puts the government in the position of signaling hostility to students and faiths that do not, or cannot, adhere to the Commandments' requirements.

## C. The Arkansas Mandate Imposes Practices of a Majority Sect of a Majority Religion.

Protestant Christians constitute the largest religious group in Arkansas. *Religious Landscape Study*, Pew Rsch. Ctr., https://www.pewresearch.org/religious-landscape-study/database/state/ Arkansas/ (last visited June 22, 2026). However, the State includes substantial populations of members from a diverse array of faith communities, including other Christian religions (such as Catholics and Orthodox Christians) as well as a wide variety of non-Christian faiths, including practitioners of Jewish, Muslim, Buddhist, Hindu, and Native American religions, among others. *Id.* Given the Founders' concerns with protecting religious liberty and adherents of minority religions underlying the Establishment Clause described in Section A, it is

21

particularly concerning that the Arkansas Act requires the display of the Protestant King James Version of the Ten Commandments in the state's public schools. By centering the Ten Commandments as an object of veneration—and by mandating the specific text favored by Protestant Christians—Act 573 impedes the interest of parents from other religions in guiding their children's religious upbringing.

    1.    <u>School Children Are Particularly Vulnerable to Social Pressure and Isolation.</u>

The risk that government promotion of one set of religious beliefs will have coercive effects on members of minority faiths is particularly salient in the school context, where children are especially vulnerable to the effects of social pressure. The Supreme Court has recognized that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Lee*, 505 U.S. at 592. Indeed, "[w]hen the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 221 (1963) (quoting *Engel v. Vitale*, 370 U.S. 421, 431 (1962)).

22

It is easy to imagine a young child seeing the Decalogue displayed alongside a list of classroom rules and equating the religious Commandments with the school's own rules. That child might fear social alienation—from both peers and teachers—if they do not adhere to the posted rules. More, they may be compelled to conform to the majority's beliefs and to suppress their own: "The law of imitation operates, and nonconformity is not an outstanding characteristic of children." *Illinois ex rel. McCollum v. Bd. of Educ. of Sch. Dist. No. 71*, 333 U.S. 203, 227 (1948); *see also Lee*, 505 U.S. at 593 ("[A]dolescents are often susceptible to pressure from their peers towards conformity, and that [] influence is strongest in matters of social convention."). This sense of exclusion can foster an unhealthy "feeling of separatism" among students of minority faiths. 333 U.S. at 227.

2. <u>Act 573 Impedes Parents' Ability to Direct the Religious Upbringing of Their Children.</u>

The social pressures of the school context create particular challenges for parents from minority faith traditions, and Act 573, were it to go into effect, would risk meaningfully impeding parents' ability to direct the religious upbringing of their children. The Supreme Court has recognized the rights of children to receive a public education that is

23

consistent with the Establishment Clause. *See, e.g.*, *Schempp*, 374 U.S. at 224 (holding that the required reading of the Bible in public schools violates the Establishment Clause); *see also McCollum*, 333 U.S. at 212 (holding that public schools may not allow sectarian religious instruction during school hours). By requiring the continuous posting of a majoritarian religious text untethered from any secular educational purpose, and requiring the text to be visible from anywhere in the room, Act 573 inherently sends a signal to students that their school, and their government, expect them to honor and even obey the Commandments' directives, and to do so as a religious text. As the Supreme Court recognized in *Stone*, the posting of the Ten Commandments in classrooms will induce "schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments." *Stone*, 449 U.S. at 42. And while "to most believers," this "may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context[,] [it] may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy" in contravention of the First Amendment. *Lee*, 505 U.S. at 592.

24

Appellate Case: 26-1722    Page: 30    Date Filed: 07/07/2026 Entry ID: 5658457

Here, the continuous posting of the Decalogue in classrooms "might be thought to raise special concerns regarding state interference with the liberty of parents to direct the religious upbringing of their children," particularly where those parents and children are members of faiths that adhere to versions of the Decalogue that differ from the King James Version, or that either do not observe the Ten Commandments at all or observe religious practices that the Commandments prohibit. *Cf. Lee*, 505 U.S. at 643-44 (Scalia, J., dissenting) (noting that families trust schools, conditioned "on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family" (quoting *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987))). The First Amendment accords "a generous measure of protection" to "[t]he practice of educating one's children in one's religious beliefs." *Mahmoud v. Taylor*, 606 U.S. 522, 547 (2025). The Supreme Court has recently recognized that this right extends to the public-school setting because "there are few religious acts more important than the religious education of … children" *Id.* Accordingly, policies and practices in school settings that risk burdening this interest raise concerns that merit close scrutiny.

Appellate Case: 26-1722     Page: 31     Date Filed: 07/07/2026 Entry ID: 5658457

Parents of a Jewish child who is compelled to continuously observe a version of the Ten Commandments stripped of its Jewish context every day, and framed as a universal set of rules for all mankind, are faced with a much more daunting task in passing along their religious traditions and teachings that interpret the Decalogue as a special covenant between God and the Jewish people. And parents of a Hindu child are faced with added challenges in passing along their faith traditions when their child is required to continuously observe a school-sponsored message that faiths that honor or recognize deities other than the God recognized by Judeo-Christian faiths are unacceptable. This places an impermissible burden on the rights of parents to direct the religious upbringing of their children.

Appellate Case: 26-1722    Page: 32    Date Filed: 07/07/2026 Entry ID: 5658457

# CONCLUSION

The judgment below should be affirmed.

July 2, 2026

*Respectfully submitted*,
*/s/ Lindsay C. Harrison*
Lindsay C. Harrison
    *Counsel of Record*
Luke C. Platzer
Noah B. Bleicher
Mary-Claire Spurgin
Amber M. Gibson
JENNER & BLOCK LLP
1099 New York Ave., NW #900
Washington, DC 20001
(202) 639-6000
lharrison@jenner.com

27

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 29 and Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), the brief contains 4,900 words.

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6), respectively, because this brief has been prepared in proportionately spaced typeface using Microsoft Word, with Century Schoolbook 14-point font.

Pursuant to Circuit Rule 28A(h), this brief has been scanned for viruses, and none have been found.

July 2, 2026

*/s/ Lindsay C. Harrison*
Lindsay C. Harrison

Appellate Case: 26-1722    Page: 34    Date Filed: 07/07/2026 Entry ID: 5658457

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of July, 2026, I caused the foregoing brief to be filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit using the appellate CM/ECF system. Counsel for all parties will be served via the Court's CM/ECF system at the email addresses on file.

*/s/ Lindsay C. Harrison*
Lindsay C. Harrison

29